**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mona Smith, an individual<br><br>Plaintiff,<br><br>v.<br><br>Valley Radiologists, Ltd., a corporation<br><br>Defendant. | No. CV11-0599-PHX DGC<br><br>**ORDER** |

Plaintiff Mona Smith's amended complaint against her former employer, Defendant Valley Radiologists, Ltd. ("Valley Radiologists"), alleges discrimination and retaliation in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.* Doc. 7. Defendant has filed a motion for summary judgment on both claims. Doc. 53. The motion is fully briefed. Docs. 53-57. For the reasons that follow, the Court will grant the motion in part and deny it in part.[1]

**I.      Background.**

The following facts are undisputed. Ms. Smith is a former radiographic technologist at Valley Radiologists. Doc. 54, at 1, ¶ 1. She has a congenital eye condition, ocular toxoplasmosis, which has resulted in substantial visual impairment. Doc. 7, at 2, ¶ 9; Doc. 54, at 1, ¶ 2. As a result of her toxoplasmosis, Ms. Smith has

---

[1] The parties' requests for oral argument are denied because the issues have been fully briefed and oral argument will not aid the Court's decision. *See* Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

centrally located blind spots in both eyes, but has enough peripheral vision to engage in normal daily activities. Doc. 54, at 1-2, ¶¶ 3, 4.

In 1972, Ms. Smith completed a two-year radiology technologist program. *Id.* at 2, ¶ 9. She was certified by the American Registry of Radiologic Technology to perform x-rays, mammographies, and bone densitometry imaging. *Id.* She worked at a hospital for seven years, performing x-rays and mammographies. *Id.* at ¶ 10. She then spent two years working at an HMO, performing x-rays. *Id.* She returned to a hospital for eight years, where she did x-ray and mammography. *Id.* From 1988 to 2000, Ms. Smith worked at a Lake Havasu hospital where she did x-ray, nuclear medicine, and mammography. *Id.* at ¶ 11. She completed an extra certification in mammography, and has additional certifications in nuclear medicine and bone densitometry. *Id.* at ¶ 12.

Ms. Smith applied for a job with Valley Radiologists on September 11, 2000, for the position of "radiographer, mammographer, nuclear medicine." Doc. 54, at 5, ¶ 30; *see* Doc. 54-1, at 100. She did not indicate on her application or resume that she had visual limitations or needed accommodations to work as a technologist. *Id.*; Doc. 54-1, at 106. Valley Radiologists hired Ms. Smith on September 18, 2000, as a radiology technologist at their Palm Valley office. Doc. 54, at 5, ¶ 31. Ms. Smith became the office's lead mammography technologist with quality assurance responsibilities. *Id.* at 7, ¶ 35.

In 2006 and 2007, Valley Radiologists implemented a company-wide transition from analog imaging to digital imaging, which involved new mammography equipment and processing techniques. *Id.* at ¶ 36. Ms. Smith was presented with and learned the new imaging protocols. *Id.* at ¶ 37. On November 11, 2008, Valley Radiologists informed Ms. Smith of their decision to reassign her from mammography duties to DEXA scan duties. *Id.* at 12, ¶ 61; Doc. 7, at 2, ¶ 12. Ms. Smith claims that she asked if she could nonetheless perform 100 supervised mammograms each year in order to maintain her mammography certification, and that Ms. Rosenwald, the Director of Operations for Valley Radiologists, agreed. Doc. 54, at 12, ¶ 63; Doc. 7, at 2, ¶ 13.

On November 19, 2008, Mr. Alvin Rice, the office manager at Valley Radiologists' Palm Valley office, completed Ms. Smith's 2008 annual performance evaluation. Doc. 54, at 13, ¶ 67. He attached an "Additional Comment" to the evaluation form, which read: "On November 11, 2008, [Ms. Smith] was asked to discontinue mammograms due to the fact that she is 'legally blind.' She will continue to do dexa and digital radiography for Valley Radiologists, LTD." *Id.* Valley Radiologists claims that Mr. Rice's comment "was not made with the authority, knowledge, or endorsement of [Valley Radiologists, Ltd.]. It was an inaccurate comment made by Smith's co-worker – who was unaware that Dr. Frouge had no knowledge of Ms. Smith's visual status, and that it played no role in his directive to have Ms. Smith taken off mammography." Doc. 54, at 13, ¶ 68.[2]

On December 2, 2008, Ms. Smith filed a Charge of Discrimination (No. 540-2008-00654) with the Equal Employment Opportunity Commission ("EEOC") alleging that Valley Radiologists discriminated against her because of her disability. Doc. 7, at 2, ¶ 14; Doc. 53, at 12. On June 15, 2009, Ms. Smith filed a second Charge of Discrimination (No. 540-2009-03285) alleging that Valley Radiologists retaliated against her for filing the first Charge of Discrimination. Doc. 56, at 10, ¶ 29; Doc. 53, at 13.

In June 2009, Ms. Smith voluntarily resigned from her employment with Valley Radiologists. Doc. 56, at 10, ¶ 30; Doc. 53, at 13. She now works as a mammography technologist for Simon Med Imaging. Doc. 56, at 10, ¶ 31; Doc. 53, at 13.

On May 26, 2010, the EEOC issued Reasonable Cause Determinations with respect to both of Ms. Smith's discrimination charges. Doc. 56, at 10-11, ¶¶ 32, 33; Doc. 8. On or about January 11, 2011, the EEOC issued Notices of Right to Sue. Doc. 7, at 3, ¶ 24.

/ / /

---

[2] Dr. Christophe Frouge is Valley Radiologists' Medical Director of Breast Imaging. Doc. 53, at 6. Dr. Threasa Frouge is Valley Radiologists' Chief Operating Officer. *Id.* at 7. All mentions of "Dr. Frouge" refer to Dr. Christophe Frouge unless otherwise indicated.

## II. Legal Standard.

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III. Analysis.

The ADA prohibits employers from "discriminat[ing] against a qualified individual with a disability," 42 U.S.C. § 12112(a), and requires employers to provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified [employee] with a disability," *id.* § 12112(b)(5)(A). The ADA also "prohibits retaliation against or interference with a person who has asserted rights under the ADA." *Barnett v. U.S. Air, Inc.*, 196 F.3d 979, 994 (9th Cir. 1998) (citing 42 U.S.C. § 12203(a) & (b)).

Once a plaintiff establishes a prima facie case of employment discrimination or retaliation, the employer must provide a legitimate explanation for its decision that is non-discriminatory and non-retaliatory. *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 50 (2006) (applying *McDonnell Douglas*'s burden-shifting framework in ADA cases). If legitimate reasons exist, it is incumbent on the plaintiff to "demonstrate a triable issue of fact as to whether such reasons are pretextual." *Pardi v. Kaiser Found. Hosp.*, 389 F.3d

840, 849 (9th Cir. 2004) (citation omitted); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 492, 802 (1973) (establishing the burden-shifting analysis for discrimination cases).

Defendant moves for summary judgment on the ground that Plaintiff cannot establish a prima facie case of discrimination and retaliation. Doc. 53, at 14.

**A.     Discrimination.**

To prevail on an employment discrimination claim under the ADA, Plaintiff must establish that (1) she is disabled within the meaning of the ADA, (2) she is a qualified individual able to perform the essential functions of the job, either with or without reasonable accommodations, and (3) her employer terminated her because of her disability. *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996). For reasons that follow, the Court concludes that Plaintiff has produced evidence to satisfy this three-part test, creating a question of fact for trial.

**1.     Disability.**

The ADA defines "disability" as (A) "a physical or mental impairment that substantially limits one or more major life activities," (B) "a record of such an impairment," or (C) "being regarded as having such an impairment[.]" 42 U.S.C. § 12102(1). "The definition of disability . . . shall be construed in favor of broad coverage of individuals under [the ADA]." *Id.* § 12102(4)(A); *see Rohr v. Salt River Project*, 555 F.3d 850, 853 (9th Cir. 2009) (noting that the ADA Amendments Act of 2008 ("ADAAA") rejects the Supreme Court's interpretation of the term "disability" in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999) and *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), and thereby expands the class of individuals who are entitled to protection under the ADA).

The ADA specifically includes reading and seeing as major life activities. 42 U.S.C. § 12102(2)(A); 29 C.F.R. § 1630.2(i). The issue is whether Plaintiff's ocular toxoplasmosis substantially limits her reading and seeing. "The term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. 'Substantially limits' is not meant to be a demanding

standard."  29 C.F.R. § 1630.2(j)(1)(i).  An impairment "need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting."  29 C.F.R. § 1630.2(j)(3)(ii).

Defendant argues that there is no evidence that Plaintiff was substantially limited in major life activities.  Doc. 53, at 15.  While Defendant concedes that Plaintiff has poor vision, it argues that she independently cares for herself, has completed high school and vocational education, has worked in a variety of settings in the field of her choice without accommodations, and is licensed to drive a car.  *Id.*  Defendant argues that Plaintiff's use of magnifying glasses to aid her vision is not evidence of a disability.  *Id.*

The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures, such as "low-vision devices (which do not include ordinary eyeglasses or contact lenses)[.]"  42 U.S.C. § 12102(4)(E)(i); *see Rohr*, 555 F.3d at 861 (noting that the ADAAA rejects the requirement, enunciated in *Sutton*, that whether an impairment substantially limits a major activity is determined with reference to mitigating measures).  The ameliorative effects of the mitigating measures of ordinary eyeglasses or contact lenses shall be considered in determining whether an impairment substantially limits a major life activity.  *Id.* § 12102(4)(E)(ii).

Defendant admitted in its answer to the amended complaint that Plaintiff "has an eye condition which substantially limits her visual acuity."  Doc. 10, ¶ 9.  Plaintiff testified that she has 20/200 vision.  Doc. 54-1, at 12 (Smith Depo. 18).  She wears corrective eye lenses, which she refers to as "a power magnifying glass of 11," "[o]nly for reading," specifically, "to evaluate [her] images and to read text and to use a computer."  *Id.*  She does not know the level of vision she has with the corrective lenses, and she does not normally wear glasses for everyday purposes.  *Id.*  The magnifying glasses "look like regular glasses" with "rather thick lenses."  *Id.* at 15 (Smith Depo. 21).  Although the glasses enable Plaintiff to read, she has centrally located blind spots in both eyes that are not correctable, and she functions solely on her peripheral vision.  *Id.* at 13-

14 (Smith Depo. 19-20). Although Plaintiff has a driver's license, she is able to drive "only small distances in familiar areas" with the use of bioptic lenses that carry a telescopic magnifier. *Id.* at 15-16 (Smith Depo. 21-22). Plaintiff has to dip her head down to look through the lens. *Id.* Plaintiff testified that she does very little driving: back and forth to work, approximately 1.5 miles from her home, and the grocery store, approximately one mile from her home. *Id.* at 16 (Smith Depo. 22).

The blind spots at the center of Plaintiff's eyes, which leave her with only peripheral vision, distinguish this case from those involving the use of ordinary glasses to correct poor vision. Although Plaintiff's impaired vision does not completely prevent, or significantly or severely restrict her from reading and driving, Defendant has not demonstrated the absence of a genuine issue of material fact as to whether her poor vision substantially limits these activities. Construing the definition of "disability" in favor of broad coverage as required, 42 U.S.C. § 12102(4)(A), the Court finds an issue of material fact on whether Plaintiff has a disability for the purposes of the ADA.

Even if Plaintiff does not have a disability as defined by the ADA, Plaintiff argues that a reasonable jury could conclude that Defendant regarded her as disabled. Doc. 55, at 7; 42 U.S.C. § 12102(1)(C). Defendant maintains that "[a]t no time during her tenure" did it consider Plaintiff to be disabled, nor did she present herself as disabled. Doc. 57, at 4. In response, Plaintiff cites a September 24, 2008 email from Defendant's then-Director of Operations, Cindy Rosenwald, to Dr. Stan When. *Id.* That email noted, in pertinent part:

> Mona Smith has encountered ongoing positioning and motion difficulties in performing mammograms, even more so now that we are digital. These issues are undoubtedly due to her limited eye vision. Mona is a wonderful employee and there are no plans whatsoever to dismiss her. However, I do need to insist she no longer perform mammo. I have been discussing this with Alvin [Rice] the last few weeks. We will offer her to continue to perform Dexa.

Doc. 56-1, at 56.  At a November 11, 2008 meeting, Ms. Rosenwald informed Plaintiff that Dr. Frouge felt the quality of her work had declined because she was "legally blind," and that she was a liability to the company in that position.  Doc. 56-1, at 2 (Smith. Decl. ¶ 11); *id.* at 38-39 (Smith Depo. 65:13-16; 66:17-20); *id.* at 59-61 (Rice Depo. 22:11-24:7).  In light of this evidence, the Court finds that an issue of material fact exists on whether Defendant regarded Plaintiff as disabled.  Plaintiff has presented sufficient evidence for a reasonable jury to find that Defendant regarded her as being legally blind.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### 2. Qualified Individual.

The ADA defines "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  "[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential[.]"  *Id.*  "Essential functions" are "the fundamental job duties of the employment position the individual with a disability holds or desires," excluding "the marginal functions of the position."  29 C.F.R. § 1630.2(n)(1).  A job function may be considered essential "because the reason the position exists is to perform that function."  29 C.F.R. § 1630.2(n)(2).  Evidence of whether a particular function is essential includes the employer's judgment as to which functions are essential and the consequences of not requiring the incumbent to perform the function.  29 C.F.R. § 1630.2(n)(3).  Here, Defendant claims that Plaintiff failed to perform the essential function of her job:  to meet Valley Radiologists' standards for consistently obtaining optimal mammography images.  Doc. 53, at 15.

Plaintiff challenges whether producing optimal images is an essential function of a mammography technologist.  Doc. 55, at 8-9.  She argues that Defendant's job description for such a technologist does not explicitly require the production of optimal images.  Doc. 56-2, at 15-16.  The job description does, however, define "essential duties" to include "[d]evelop and evaluate the film for technical quality such as density

contrast, definition, and distortion," and "maintain and monitor the quality control for digital imaging." *Id.* The job description also lists, under "essential physical requirements," "[h]earing and visual acuity sufficient to perform examination, observe patients, read monitors and documents, and hear equipment alarms[.]" *Id.* at 16. These descriptions clearly suggest that the ability to produce digital images with the technical quality needed for accurate mammography analysis, including quality control evaluation of image characteristics such as density contrast, definition, and distortion, is an essential duty of the job.

Plaintiff relies on Dr. Frouge's testimony that the essential function of a mammography technologist "[i]s to provide mammography that the radiologist can read, that's pretty much the only thing I require from a mammography technologist." Doc. 56-2, at 22-23 (Frouge Depo. 103:17-104:3). But Dr. Frouge went on to explain that "I'm not in charge of the technologist, this is my only concern, and you can look at the very first sentence that I said here: My only concern is the quality of the mammogram provided by the technologist." *Id.* at 23 (Frouge Depo. 104:7-13). These statements do not suggest that optimal image quality is not an essential function of the job. To the contrary, Dr. Frouge states that the "quality of the mammography provided by the technologist" is his primary concern. Having considered Defendant's judgment that optimal mammogram images are essential, as well as the consequences of not requiring such optimal images, the Court concludes that producing optimal mammogram images is an essential function of a mammography technologist in Defendant's employment.

The question, then, is whether Plaintiff can produce optimal images, with or without reasonable accommodation. Defendant notes that Plaintiff's annual evaluation showed lower scores in several areas from 2007 to 2008, and a decrease in overall score from "5" to "4." Doc. 54, at 7, ¶ 39; *compare* Doc. 54-2, at 18 (2007 evaluation) *with* Doc. 54-2, at 28 (2008 evaluation). Plaintiff responds that a score of "3" indicates that an employee's performance is "normal and expected" and a score of "5" means "exceptional." Doc. 56, at 2, ¶ 39; *see* Doc. 54-2, at 27. Plaintiff argues that she

performed the required functions of her position "with excellent evaluations, for eight years." Doc. 55, at 9.

In Defendant's own employee performance survey, a score of "3" indicates that "[t]he employee consistently meets the position standards; performance is fully acceptable and demonstrates sound balance between quality and quantity." Doc. 54-2, at 27. In her November 19, 2008 performance evaluation, Plaintiff received consistent scores of "4" in the "Quality of Work" category. *Id.* None of the comments in the review indicate that Defendant had concerns about Plaintiff's work. Rather, the comments indicate that Plaintiff "is a very good, knowledgeable[,] and dedicated technologist" (Doc. 54-2, at 27), that she "is highly motivated, requiring very little supervision" (*id.* at 28), and that she "is a very dependable employee" (*id.*).

Plaintiff was diagnosed at age 10 with blindness resulting from toxoplasmosis. Doc. 54-1, at 13 (Smith Depo. 19:14-15). Yet even with this condition, she was able to complete a radiology technologist program, obtain certification to perform x-rays, mammographies, and bone density imaging, and find work as an x-ray and mammography technician. Neither party alleges that Plaintiff's vision worsened in recent years. The only change the parties have identified that could have caused the alleged reduction in quality is Valley Radiologists' transition from analog to digital imaging in 2006 and 2007. Doc. 54, at 5, ¶ 36. Plaintiff's November 21, 2007 performance review, however, seems to indicate that she had no problem handling this transition. Tammy Sanchez, a quality assurance manager and mammography/DXA coordinator for Valley Radiologists, commented in the review that Plaintiff "has taken on learning digital mammography and digital DXA . . . over the past year. She has grasped these new forms of imaging and saving images very comfortabl[y.] I depend on and appreciate [Plaintiff's] confidence and attention to detail. QC detail in mammography and adher[e]nce to new protocols/procedures is impeccable." Doc. 54-2, at 18.

Despite Plaintiff's positive reviews, Defendant claims to have worked with her over the eight months prior to her removal from mammogram duties "to improve the

1  quality of her images without knowing anything about [her] visual status – but [she]
2  nonetheless continued to submit images of low quality that compromised patient care,
3  prompting her reassignment." Doc. 57, at 3. Defendant cites a March 2008 email by Ms.
4  Rosenwald, memorializing concerns with the quality of Plaintiff's work:

> [Plaintiff] is to be pulled off mammo immediately. Dr. Threasa Frouge stated her lack of imaging the entire breast puts us at great liability. I am very concerned this has been an issue for quite some time. . . . Has this been an ongoing issue with [Plaintiff]? Is she not checking her images before they are sent to the rads? Has it been addressed in the past? I need to know what steps we take to ensure the mammo images are of excellent quality.

Doc. 54-2, at 33. A peer review process was initiated for Plaintiff that month, but Ms. Rosenwald noted that "this cannot be a permanent fix, having a peer review each exam." Doc. 54-2, at 35.

Plaintiff argues that every mammography technician produces some suboptimal images, that Defendant has no procedure for determining the ratio of suboptimal images produced by a particular technologist, and that Defendant does not know the percentage of suboptimal images attributable to Plaintiff. Doc. 55, at 9. Even if Defendant could show that Plaintiff had more suboptimal images than her peers, this could be by virtue of the fact (not dispute by Defendant) that she performed more mammograms than any other technologist at the office. *Id.* Lisa Noyes, the Director of Operations for Valley Radiologists, admitted that all technologists have suboptimal images "[a]t some point or another" and that a suboptimal image could be the technologist's fault, or could be the result of the patient moving. Doc. 56-2, at 26-27 (Noyes Depo. 28:22-29:9).

On this record, even with the conclusion that optimal image quality is an essential duty of the technologist's job, a question of material fact exists as to whether Plaintiff is a qualified individual who can perform the essential functions of a technologist with or without reasonable accommodation.

### 3. Causation.

"The ADA prohibits employment decisions made because of a person's qualifying disability, not decisions made because of factors merely related to a person's disability." *Lopez v. Pac. Maritime Ass'n*, 657 F.3d 762, 764 (9th Cir. 2011) (citing *Hazen Paper Co. v. Biggens*, 507 U.S. 604, 611 (1993) (holding that an employer's decision "wholly motivated by factors other than age" does not constitute age discrimination, even if "the motivating factor is correlated with age")). For purposes of the ADA, conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for termination. *Humphrey v. Mem'l Hospitals Ass'n*, 239 F.3d 1128, 1139-40 (9th Cir. 2001).[3]

In an email to Ms. Noyes in early 2009, Plaintiff wrote: "On November 11, 2008, Cindy Rosenwald informed me that the radiologists did not want me to do mammograms anymore. She stated that my image quality was not good and it was felt it was because I am legally blind. Cindy also said that I was considered to be a liability to Valley Radiologists as a mammographer due to my visual impairment." Doc. 54-2, at 43. As discussed above, Ms. Rosenwald wrote in an email on September 24, 2008 that Plaintiff "has encountered ongoing positioning and motion difficulties in performing mammograms, even more so now that we are digital. These issues are undoubtedly due to her limited eye vision." Doc. 56-1, at 56.

Because there is evidence that Plaintiff was reassigned from her position as a mammogram technologist because of her visual impairment, or because of conduct resulting from her impairment, there is a triable issue of material fact as to whether she was terminated because of her disability.

---

[3] There are some narrow exceptions to this rule that do not apply here. For example, the ADA authorizes discharges for misconduct or inadequate performance caused by alcoholism or illegal drug use. *See* 42 U.S.C. § 12114(c)(4). The Ninth Circuit has applied a distinction between disability-caused conduct and the disability itself as a cause for termination only in cases involving illegal drug use or alcoholism. *Humphrey*, 239 F.3d at 1140 n.18.

### 4. Conclusion.

Plaintiff has raised triable issues of material fact on the three elements of an ADA discrimination claim – whether she is disabled within the meaning of the ADA, whether she is a qualified individual able to perform the essential functions of the job of mammogram technician with or without reasonable accommodations, and whether Defendant terminated her because of her disability. *See Kennedy*, 90 F.3d at 1481. Defendant's motion, which is limited to arguing that Plaintiff cannot prove these three elements, is therefore denied with respect to Plaintiff's ADA discrimination claim.

### B. Retaliation.

For her ADA retaliation claim, Plaintiff seeks compensatory damages, declaratory judgment, and punitive damages. Doc. 7, at 5. Plaintiff cannot recover compensatory and punitive damages for an ADA retaliation claim. *Alvarado v. Cajun Operating Co.*, 588 F.3d 1261, 1269-70 (9th Cir. 2009). Plaintiff's declaratory judgment claim is equitable in nature, *Smith v. Barton*, 914 F.2d 1330, 1337 (9th Cir. 1990), and may be asserted in this case for the Court to decide, *Alvarado*, 588 F.3d at 1270.

To prevail on an illegal retaliation claim under the ADA, Plaintiff must show (1) involvement in a protected activity, (2) an adverse employment action, and (3) a causal link between the two. *Coons v. Secy' of U.S. Dept. of Treasury*, 383 F.3d 879, 887 (9th Cir. 2004). The Ninth Circuit has adopted the EEOC's test for adverse employment actions: "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity." *Ray v. Henderson*, 217 F.3d 1234, 1242-43 (2000) (citation omitted).

Plaintiff claims that Defendant took an adverse employment action in response to her filing of the initial EEOC charge when it refused to allow her to perform 100 mammograms a year, a refusal that would have resulted in her losing her mammogram certification. Doc. 7, at 4-5. Defendant does not dispute that filing an EEOC charge is protected activity, but argues that there is no credible evidence that it agreed to allow Plaintiff to continue performing 100 mammograms a year or retaliated against Plaintiff

by rescinding the agreement. Doc. 53, at 16. Specifically, Defendant claims that Plaintiff can present no evidence that it agreed to allow her to do 100 mammograms per year or that it reneged on that agreement once she filed an EEOC charge. Doc. 57, at 5-6.

Plaintiff's only response is that both she and Mr. Rice testified in deposition that Ms. Rosenwald agreed to allow Plaintiff to perform mammograms under supervision. Doc. 55, at 11. *See* Doc. 56-1, at 39 (Smith Depo. 66:1-9); *id.* at 40 (Smith Depo. 71:18-24); Doc. 56-1, at 62 (Rice Depo. 25:21-25); *id.* at 65 (Rice Depo. 45:4-6). Defendant asserts that even if Ms. Rosenwald said something that led Plaintiff to believe she could do 100 mammograms a year, there is no evidence that Dr. Frouge or any other radiologist knew of or agreed to Plaintiff's request. Doc. 57, at 4. Defendant argues that Ms. Rosenwald is "not a member of [Valley Radiologists]," and therefore could not speak for Dr. Frouge or the mammogram committee. *Id.* at 4-5. Ms. Rosenwald testified that she did not have authority to make the decision allowing Plaintiff to perform 100 mammograms a year, that such a decision could only come from a radiologist, and that at no time was she informed by any radiologist that Plaintiff was allowed to perform mammograms once she was transferred to DEXA.[4] Doc. 54-2, at 23-24 (Rosenwald Depo. 56:25-57:22). Dr. Frouge testified that he never agreed to allow Plaintiff to perform 100 mammograms a year, and that Ms. Rosenwald would have no authority to make that offer to Plaintiff. Doc. 54-1, at 78-79 (Frouge Depo. 151-152).

Plaintiff presents no evidence that Ms. Rosenwald had actual authority to make the mammogram decision. Without actual authority, Ms. Rosenwald could bind Defendant only if she had apparent authority. *See NLRB v. Dist. Council of Iron Workers of the State of Cal.*, 124 F.3d 1094, 1099 (9th Cir. 1997). "Apparent authority arises from the principal's manifestations to a third party that supplies a reasonable basis for that party to believe that the principal has authorized the alleged agent to do the act in question." *Id.*

---

[4] Ms. Rosenwald was also asked whether she would have told Plaintiff, or given Plaintiff any reason to think that she would be permitted to perform 100 mammograms a year. Doc. 54-2, at 24 (Rosenwald Depo. 57:23-25). Defendant's excerpt of Ms. Rosenwald's deposition does not include her response to this question.

(citing *NLRB v. Donkin's Inn*, 532 F.2d 138, 141 (9th Cir. 1976), *cert. denied*, 429 U.S. 895 (1976)).  Plaintiff cannot establish apparent authority merely by claiming that Ms. Rosenwald purported to exercise authority, or that Plaintiff and Mr. Rice believed that Ms. Rosenwald had authority.  Apparent authority "must be established by proof of something said or done" by Defendant on which Plaintiff reasonably relied.  *Id.*  Plaintiff cites nothing that Defendant said or did that would allow her to reasonably rely on Ms. Rosenwald's alleged agreement that she could continue performing mammograms.

Because Plaintiff has not presented evidence that Ms. Rosenwald had either actual or apparent authority to bind Defendant to a 100-mammogram per year commitment, and therefore has not presented evidence that Defendant made such a commitment, Plaintiff cannot show that she suffered an adverse employment action when Defendant did not permit her to perform 100 mammograms per year.  And because Plaintiff cannot show that she suffered an adverse employment action as a result of filing her first EEOC charge, Defendant is entitled to summary judgment on the retaliation claim.  *See Celotex*, 477 U.S. at 322.

**IT IS ORDERED:**

1. Defendant's motion for summary judgment (Doc. 53) is **granted** with respect to Plaintiff's ADA retaliation claim and **denied** with respect to Plaintiff's ADA discrimination claim.

2. The Court will set a final pretrial conference by separate order.

Dated this 9th day of August, 2012.

David G. Campbell
United States District Judge